King, J.
This action was commenced in the court of common pleas •of Huron county, Ohio, setting forth that in March, 18.97, the plaintiff and the defendant George O’Hara entered into ■ a contract, by the terms of which George O’Hara agreed that if plaintiff and his family would move onto certain ’■premises therein described, and would contribute of his services and money and property for the payment of the pur *368 chase price of the said farm, and if plaintiff, together with-his wife, would devote their time in assisting the said George-O’Hara upon his own farm which he then owned and until the place upon which plaintiff was to move should be paid for, that plaintiff should have the use of the same during-the life of George O’Hara upon payment of the taxes thereon, and that at the death of the said George O’Hara, who-was plaintiff’s father, the land therein described should become the property of plaintiff. The land was described as. forty-one and one-half acres in the township of New London, in said county. That this contract was performed by the-plaintiff in so far that he and his wife moved upon the-premises; that they worked in accordance with said agreement, and contributed of their earnings, of the produce of' this place and of money which they possessed,until the farm-was nearly paid for, and until the spring of 1895, when the defendant wrongfully repudiated the agreement, ordered, them off the premises,and threatened to eject them by legal, proceedings. They pray for a decree that the contract maybe specifically performed,and that the plaintiff, who in pursuance of the threat of the defendant removed from the premises, may be placed back in possession,and that for the time-he has been out of possession he shall be allowed an account of the rents and profits resulting therefrom.
This contract is denied in the answer, and it is further-claimed that the same was within- the statute of frauds,and. void, because it was not in writing, as provided in said statute.
The first question arising is whether or not a contract was-made, and if so, what its terms were. Th'at some contract-was made is evident from the testimony of all the witnesses, the disagreement being as to its terms. The contract as-. testified to by the plaintiff is substantially as follows:
That in February, 1887, he told his father, the defendant George O’Hara, that his wife’s folks were proposing to give- *369 her $100, and asked his father if he would give him a like sum with which plaintiff would purchase a working team and would rent a farm that he had in view. That his father told him he would go and look at the farm, and see whether it was suitable or not. This'he did,and advised his son that he had better not rent that farm,but said it would be better -to buy one. Plaintiff told his father he had no means to ■pay for it, The father said that he would buy it, and they would work together upon the newly acquired place as well as upon his father’s farm-, and from the produce of both places, the proceeds of the labor of both, they would pay for the new farm. The son should have possession of it and -should pay the taxes, and when it was paid for, he should continue to have the occupation and proceeds upon the payment of the taxes,until his father’s death, when the place should become the property of the son as his share of his ■father’s estate.
The plaintiff’s(wife testifies to certain statements of the defendant, corroborating her husband. Other witnesses testify to statements and declarations of the defendant, -George,upon this matter. In the fall of 1891, or 1892, one George Prosser talked with the old gentleman about buying his apples. The old man told him that Will had some apples,and that he should go and see them and buy them; that Will was in debt and needed all the money he could get, .and that when'he had succeeded in paying for the farm on which he lived, it was to be his. In the spring of 1887, he told Peter Tompkins that he was going to buy a farm for Will, and in the same spring he told George Stewart that he had bought the Golding farm for Will. The same spring he talked with Sidney Hosmer about buying a farm for him, ¡and said that he was buying a farm for Will, but that the witness’ farm had no buildings on, and he wanted a place -with a house. Shortly after this he told the same witness -¿that he had bought the Golding farm; that Will was to work *370 with him until it was paid for,and then it was to be his..
He bought a farm, the lands described in the petition, of one Leonard Golding, and in the course of the negotiations he told Mr. Golding that he wanted to help Will to a farm, to a place to live on; that he and Will were going to work together and to pay for it.
^ This constitutes the principal part of the evidence of the plaintiff relating to the contract itself; but in addition to this are circumstances that Will, at the time of the purchase of the land,was living on a rented farm; that immediately after its purchase he and his family moved upon this farm known in the evidence as the Golding farm; that he con. tinued to reside there, as stated in the petition,until April, 1895, a period of eight years. That during that time he not only worked this place, but worked upon his father’s farm, distant about a mile, a great deal of his time, and that his wife also worked in his father’s house, and many seasons worked out of doors at such work as #she could do. That the produce of the Golding farm, or a large part of it, was delivered to his father,' or sold at the same time as his. father’s crops. That no account was kept between the father and son of the proceeds of these crops. In the summer of 1887, soon after the purchase of the farm, or in the fall, the wife received from her folks the $100 that had been talked of in the spring before, and the son, instead of using it to buy a team as had been suggested, paid it over to Mr. Golding. This is corroborated by Mr. Golding himself, who says he received $100 from William, William made-certain repairs to the buildings and to the fences upon this-farm. He made no valuable or permanent improvements, devoting all he could get off from the farm to pay for it, and not expending money in improvements until the farm-was paid for. The farm, by the joint work of the two men, according to the evidence of the plaintiff’s witnesses, was-substantially paid for in the summer of 1893, or the crops. *371 then on hand were sufficient to pay the balance remaining at that time.
On the other hand, the defendant denies in toto the making' of any such agreement. He says that he bought the place, and rented it to his son Will who moved upon it. He admits that Will remained there for the period named,and he says that he never paid him any rent; that occasionally he-turned over to him certain parts of the produce, but it was to apply on rent, but how much this was the defendant fails to show. How much rent he was to pay the defendant fails-to show, and while he denies that Will ever paid 1100, we think that the evidence clearly shows that-he did. He disputes in some respects the amount of work which Will and also his wife did,but there is no difficulty in finding that the-son and his wife worked faithfully and steadily on both of those farms until the summer of 1893. There is no difficulty in arriving at the conclusion that tbe produce of the Golding farm was contributed to pay the purchase price, and there is no difficulty in determining from the evidence that the contract under which the plaintiff entered upon the possession of these premises, is substantially as testified to by the-plaintiff.
He is supported in that by nearly every fact that is undisputed,and by the testimony of a large number of uncontradicted and unimpeached witnesses.
But it is asserted that this does not make a contract that' a court of equity can enforce, partly because it is within the statute of frauds, and partly because it is said that it is-a trust,and the terms of which the defendant has denied, and in such a state of the issue the court will not carry out specific performance. We remark upon this that courts; have been quite liberal in giving effect to such contracts between father and son. They have been quite universally sustained when they have been proven. They have been sustained upon the theory that they are gifts, but there is. *372 ■more in this case than a gift. There is a valuable consideration passing from the son over to the father, or going into and making up the consideration that was paid for this land.
It is said in the 15th Ohio Reports, page 248, and on page 253:
‘‘Bart performance of parol contracts, especially when the non-execution would operate as a fraud on the rights of the vendor, have repeatedly been enforced in equity,”
And there are a number of cases in which the facts have been no stronger than in the one at bar. In Freeman v. Freeman, 43 N. Y. 34, it is said that:
‘‘A parol promise by the owner of land to ‘give’ it to another, accompanied by actual delivery of the possession thereof to him, will be enforced in equity by a decree for ■specific performance, where the promisee, induced by such promise, has made substantial improvements and considerable expenditures upon the premises with the knowledge of the promisor. ”
In the same case,on page 39, the court say:
‘‘Anything that may be detrimental to the promisee or ‘beneficial to the promisor in legal estimation will constitute a good consideration for a promise, Expenditures made upon permanent improvements, upon land with the knowledge of the owner, induced by his promise, made to the party making the expenditure, to give the land to such party, constitute in equity a good consideration for the promise. The statute of frauds has no bearing upon the -case. If the promise reduced to writing could, under the circumstances, be enforced in equity, it may be, although by paroland cites many cases.
In Lobdell v. Lobdell, 36 N. Y. 326, it is decided that ‘‘a parol agreement between father and son chat if the son will enter upon a certain tract of land and improve it, the father will make him a deed of it, if in pursuance of that •agreement the son enter on the land and occupy and improve it, such a case is not within the statute of frauds.” The court say,on page, 330:
*373 “The promise to convey, as found by the referee, was not a mere voluntary one, but was made upon a valuable consideration, emanating from a loss or disadvantage to the promisee. Pliny (the father) said to Seymour (the son), if you bestow certain work and labor upon this piece of land, I will convey it to you. It cannot be doubted that if, after Seymour has done the work, Pliny refuses to convey, an action at law will lie for the breach of the contract; the consideration is sufficient to support the promise. A court of equity does not require more in this respect than a court of law, except that it will look at the consideration, with reference to its adequacy, in order to ascertain whether the inadequacy is so great as to show the contract fraudulent or unconscionable, in which case it will refuse its aid, and leave the complainant to his action at law. (Seymour v. Delaney, 3 Cow,, 145). On the other hand, ‘if the promis- or, on the faith of the promise, does some act, or enters into some engagement, which the promise justified, and which a breach of the promise would make very injurious to him, this equity might read as confirming and establishing the promise in much the same way as a consideration for it would’. (3 Parsons on Cont,, 359; Crosbie v. McConald, 13 Ves., 188.) In Shepherd v. Bevin (9 Gill., 32), it was held, that money expended in improvement of land, by a son, on the faith of an agreement of his parent to convey the land to him, constituted a consideration for which specific performance might be decreed against the heirs of the parent. ’’
And the court further say, referring to the case before them:
“To permit such other party or his heirs now to withdraw from the performance of the contract, would aid a manifest fraud against the plaintiff. (Parkhurst v. Van Cortland, 1 Johns. Ch., 284; Malins v. Brown, 4 N. Y., 411; 2 Story.Eq., sec. 795.)”
In Bohanan v. Bohanan, 96 Illinois, 591, father and son, both married, were living together upon the father’s farm. A disagreement arising, the son proposed to remove to an *374 other state, the wife’s father offering him $1,000 to aid him in so doing. The plaintiff’s father, not wishing the son to move away, and as an inducement for him to remain, offered to purchase for him a certain tract of land in the neighborhood. The son accepted this proposition, abandoned his contemplated removal and relinquished the $1,000 offered him by his father-in-law. His father purchased the land as he promised, but took the deed in his own name. The son went into possession under the contract, repaired the house and the fences, made gates, put a pump in th9 well and made improvements of like character, and raised a crop upon the land, but before his family had come into the occupancy, he died. A bill was filed by his children and heirs at law to compel a conveyance of the land by their grandfather, and it was held that the relinquishment by the son of the $1,000 offered him by his jvife's father, on abandon-' ing his proposed removal,was a sufficient consideration for the promise of the father to convey the land, and having taken possession under that promise, he was entitled to a conveyance. The court say on page 598:
“A. parol promise to convey a tract of land,"^flfiade by a father to the son, may be enforced in equity, where the son has taken possession of the land under the contract and expended money in making lasting and valuable improvements. Such a promise rests on a valuable consideration. ”
In Smith v. Yocum, 110 Illinois, 142, a father made a verbal agreement with his son that if the latter would remain in the state and go upon and live on an eighty-acre tract of land of the former,and improve it, it should be the son’s on the father’-s death, the son to pay a certain share of the crops during his father’s life, which contract was performed by the son, and it was held that the acts of part performance were sufficient to take the case out of the statute of frauds, and a specific performance after the father’s death was properly decreed as against the other heirs. The *375 circumstances of that case are a good deal like those in the one at bar, except that before the question of its enforcement arose the father died.
In Irwin v. Dyke, 114 Illinois, 302, there was a somewhat similar agreement between father and son. The father was living upon a rented farm,and he proposed that his son should come and live upon the same farm, and they would work together,and as soon as they got money enough they would buy a farm and it should belong to the son. The son came and lived with the father for four years, his wife doing the house work and he the farm work, when the father and another person purchased 200 acres of land, taking a deed to themselves jointly. They made a cash payment of about half the consideration,and gave promissory notes for the balance, and the son and the third person took possession of the farm by moving upon the land. ' They made a verbal division of it between them,and occupied it until the commencement of the action. The following year the father died. Of the purchase money remaining unpaid at the time of the purchase by the father, the son paid a part. The only consideration which the son parted with was about four years of work and the payment of about $1,200 in money out of a consideration of $3,500 for the undivided half of this property. Of the balance of . the consideration the father had paid $2,000. The proof in the case consisted largely of the declarations of the deceased father to the effect that his son had four.years of work in the land, which the court said was a recognition that the purchase of the land was for Lewis in fulfillment of some agreement to buy a farm, and the court say,on page 306:
“That it was on the faith of the agreement that he should have the land that Lewis rendered the services which he did for his father,moved upon and lived on the land,making some improvements, and paid a considerable portion of the purchase money which his father agreed to pay for the *376 land, as much as |1,200 of it. We think this brings the case within the rule of repeated decisions of this court, that where a father makes a verbal agreement with a son to convey to him a tract of land if the latter will go and live upon the same, make expenditures upon and improve it, and this is done in reliance upon the promise, a court of equity willenforce a specific performance of the agreement” —citing many Illinois cases.
These authorities are sufficient, we think, to enable us to hold that an agreement like the one shown tp have been made here will be enforced by a court of equity, It would be unconscionable to refuse to enforce it. This son gave his entire services for a number of years,and the result of those services went towards carrying out explicitly the agreement that had been made between him and his father, and from which he reaped no benefit unless he was thereby acquiring an interest in this land.
There is an additional fact which it is claimed operates to prevent the enforcement. In the summer of 1898, the father and son had a dispute, and the father then said to the son ‘‘I want you to pay me rent for that farm over there,or you will have to get off it.” ‘‘You will have to pay rent hereafter” is the language of some of the witnesses, The son said he would not pay rent, insisted that the agreement was that he was to work as he had and as he was willing to do, and the farm was to be his. The father was obdurate and refused to yield the position which he took. The conversation took place in the harvest field on the father’s home place, He continued to work on his father’s farm until the season’s work was done up, when he afterwards refused io go over there and work any more, but he remained upon the place where he was living until the spring of 1895, at- which time his father ordered him to leave, and threatened him with a suit to put him off the premises if he did not leave. The son thereupon went and rented a place and moved upon the rented place, and abandoned this one in pursuance of that threat.
Andrews Bros., for Plaintiff.
Stewart & Rowley, for Defendant.
It is said that prevents him from maintaining this action, because he is out of possession, We do not so look at it. He simply obeyed his father’s express direction, notice and order to leave these premises. He would not thereby, we think, forfeit his interest in the property. If he had up to that time executed the contract upon his part, and if he was still ready and willing to complete its performance, we think that his moving away from the premises would not forfeit his right to have the contract still performed. He was in ignorance of his legal rights, but that does not prevent him from having those rights enforced,
We are of the opinion that he is entitled to a specific performance of this contract substantially as it was decreed by the court of common pleas. We think for the time he has been out of possession, to-wit, three years, he is entitled to recover the rental value of these premises at $80 per year, less, however, the amount, which is not before us, that the father has in the same time paid as taxes upon the property, and a decree will therefore be drawn in accordance with this opinion, defendant to pay the costs of this action.